**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 23 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

vs.

CLAUDINE ANN VALLO,

       Defendant - Appellant.

No. 99-2328
(D.C. No. CR-98-572-JP)
(D.N.M.)

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

vs.

DAVID EDWARD CHINO,

       Defendant - Appellant.

No. 00-2078
(D.C. No. CR-98-572-JP)
(D.N.M.)

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-98-572-JP)

Jonathan Gurston ( Norman C. Bay, United States Attorney, and Jason Bowles, Assistant United States Attorney, on the briefs), Albuquerque, New Mexico, for Plaintiff - Appellee United States of America.

Jerry Daniel Herrera, Albuquerque, New Mexico, for Defendant - Appellant Claudine Ann Vallo.

Dawn T. (Penni) Adrian, Albuquerque, New Mexico, for Defendant - Appellant David Edward Chino.

Before **BRORBY**, **EBEL**, and **KELLY**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendants-Appellants David Chino and Claudine Vallo were jointly tried and convicted of second-degree murder, 18 U.S.C. §§ 2, 1111(a), 1153(a), of Zachary Vallo, age sixteen months. Mr. Chino also was convicted of multiple counts of assault on Zachary Vallo, 18 U.S.C. §§ 113(a)(6), 1153(a). He was sentenced to 12 months with 1 year of supervised release on the assault counts and 210 months on the second-degree murder count with 3 years of supervised release, all terms concurrent. Ms. Vallo was sentenced to 240 months with 3 years of supervised release.

On appeal, both Mr. Chino and Ms. Vallo contend that the evidence was insufficient to convict them of second-degree murder. Ms. Vallo also argues that the second-degree murder count against her should have been dismissed based upon prosecutorial vindictiveness, and that she should have been granted a downward adjustment for acceptance of responsibility. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and we affirm.

2

In view of the challenges to the sufficiency of the evidence, we review the pertinent trial evidence in some detail. On July 25, 1998, Valerie Chino, David's mother, brought Zachary into the Acoma-Laguna-Canoncito Clinic. Zachary was not breathing, and "appeared to be having a seizure, posturing [1] and was limp, listless, unresponsive." Trial Tr. ("Tr.") at 110 (Dr. Scherf). Zachary also had contusions on his head, face, and chest. Id. at 112.

Zachary was immediately flown to the University of New Mexico Hospital ("UNM Hospital") in Albuquerque where he remained in critical condition. The doctors who cared for him there testified that he continued to posture, indicating deep, "ongoing evolution of brain injury." Id. at 513-14 (Dr. Katz). The doctors found that Zachary had subdural hematomas, internal bleeding on the brain, on both the sides and the back of his brain. Tr. at 311, 515-16. At trial, doctors testified that the extent of Zachary's injuries could not have been caused by the child falling from a stroller into some rocks, or falling off a wagon. E.g., id. at 516. Several doctors testified that Zachary had been the victim of child abuse based on the types of injuries he had received and the fact that the family had no

---

[1] There are two types of posturing: decorticate and decerebrate. For our purposes, however, we will not distinguish between the two types as both are indications that there has been "serious neurologic damage to the brain." Tr. at 356, 364-65 (Dr. Sapien).

3

explanation for the injuries. Tr. at 114-15, 317-18.

As a result of his injuries, Zachary died on July 27, 1998, two days after being brought to the hospital. The medical examiner performed an autopsy and concluded that Zachary had died of non-accidental head wounds and that the death was a homicide. Id. at 85-86. The autopsy confirmed that Zachary had subdural hemorrhaging on both sides and the back of his brain. Id. at 77. There was bleeding around the optic nerves of his eyes, specifically, "bleeding along the retina or the back portion of the eye where the retina had actually been torn away from the back of the eye . . . ." Id. (Dr. McFeeley). Zachary's brain also showed evidence of a prior brain injury, one that probably occurred several days before Zachary's death. Id. at 80. In addition, Zachary had thirteen bruises and abrasions on his head and neck, three on his chest and abdomen, seven on his arms, and seventeen on his legs. Id. at 74.

As to the timing of the fatal brain injury, the medical examiner concluded that the fatal injury had occurred "very shortly before the child was originally taken to the hospital," less than forty-eight hours before his death. Id. at 80-81. At trial, other expert medical testimony concurred with this conclusion. Id. at 520-21 (Dr. Katz), 534, 542-43 (Dr. Wilson). The medical examiner testified that the subdural hemorrhaging could not have been caused by a simple fall out of a stroller or wagon or from a "slight push off of a chair." Id. at 99-100 (Dr.

4

McFeeley);  see also  id.  at 62-63, 81-82.  However, throwing a child to the ground with "substantial impact" or "a lot of force" could cause these types of injuries. Id. at 62-63.  Subdural hemorrhaging is "almost invariably . . . due to trauma," such as "a shaking kind of an injury, an acceleration-deceleration that would tear those small [blood] vessels . . . , or an impact with something, or the combination of those."  Id. at 81.  The kind of force necessary to produce the type of retinal injury found in Zachary would be "a violent kind of . . . shaking."  Id. at 91-92. At trial, another medical expert agreed with this conclusion, stating that Zachary died by "the infliction of violent trauma . . . in the form of some type of acceleration forces, a combination of shaking and blunt force trauma which scrambled his brain . . . ."  Id. at 534 (Dr. Wilson).

At the time of his death and for the preceding several months, Zachary had been living with his mother, Claudine Vallo, and her boyfriend, David Chino, on the Acoma Pueblo in New Mexico.  David Chino was not Zachary's natural father.  Before his mother moved in with David Chino, Zachary had no medical history of seizures and his medical checkups reflected no bruises or other signs of abuse.  Id. at 296, 303, 305-06 (Dr. Green).  During the trial, Joseph and Irene Thompson, two of Claudine Vallo's other children, testified to witnessing incidents of David Chino hitting, shaking, and throwing Zachary into a wall.  Tr. at 182-85, 442, 444-45.  Claudine Vallo not only witnessed some of these

5

incidents of abuse, but told her other children to ignore the sounds of the abuse. Id. at 183-85. During questioning by the FBI, David Chino admitted that he had trouble controlling his anger and that approximately two months before Zachary's death, he had dropped Zachary into his crib from a height of about two and a half feet in order to get Zachary to stop crying.  Id. at 413.

Claudine Vallo testified at trial that in the late afternoon of July 25, 1998, the day Zachary was taken to the hospital, she was home with Zachary and had prepared something for him to eat.  Id. at 666-67.  Zachary was sitting next to his mother in a chair with no arms.  When Zachary did not drink his milk, Ms. Vallo got angry and pushed him off the chair.  Id. at 667-68.  Zachary fell to the floor and hit the top of his head.  Id. at 668, 670.  Ms. Vallo picked him up and put him back in the chair, but Zachary still would not drink his milk.  Again, Ms. Vallo became angry and pushed Zachary out of the chair.  Id. at 669.  He landed on the floor on the side of his head.  Id. at 670.  Zachary cried a little bit and Ms. Vallo picked him up, told him she was sorry, and put him in his crib.  Id.  A little while later, Ms. Vallo noticed that Zachary was having a series of seizures.  Id. at 670-71.  According to Ms. Vallo, David Chino arrived home a few minutes later. Id. at 671.

At trial, two witnesses testified that on July 25, 1998, David Chino left work around 4 p.m. "upset," "enraged," and "furious."  Tr. at 163-64 (Leland

6

Robert Vallo), 402 (Brian Todd Hamrick). In an interview with the FBI, Mr. Chino stated that on that same day, he arrived home from work around 6:15 p.m. and saw Zachary lying on the floor motionless. Mr. Chino picked Zachary up and shook him, but the child did not respond. Tr. 413-14. Mr. Chino took Zachary outside and directed someone to contact his mother, Valerie Chino, to take Zachary to the hospital.

Mr. Chino and Ms. Vallo did not accompany Zachary to the hospital on July 25 as they were worried about child abuse questions. Id. at 414-15, 672. They did make a short visit to Zachary on July 26, but left soon after the police arrived. Id. at 127-29, 140. After leaving the hospital, Mr. Chino and Ms. Vallo went to a friend's house and "kicked back" and "drank some beer." Id. at 457. Neither mentioned Zachary.

After Mr. Chino and Ms. Vallo were arrested, the government held two debriefing sessions with Ms. Vallo in an attempt to work out a plea in exchange for her testimony against Mr. Chino. At the time of the debriefings, Ms. Vallo was charged with assault resulting in serious bodily injury and accessory after the fact to second-degree murder. Based on subsequent medical information and the government's belief that Ms. Vallo had not been completely truthful during the debriefings, the government charged Ms. Vallo with second-degree murder. Before doing so, the government communicated to Ms. Vallo its concerns. Ms.

7

Vallo decided she was no longer interested in a plea and asserted her right to a trial. Before the trial began, Ms. Vallo filed a motion to dismiss the homicide count due to prosecutorial vindictiveness. I R. (99-2328), Doc. 51. The district court held an evidentiary hearing on the motion and then denied it. I R. (99-2328), Doc. 73.

At the close of the government's case, both Mr. Chino and Ms. Vallo moved for judgments of acquittal on the second-degree murder counts, which the district court denied. Tr. at 565, 571. The motions were renewed at the conclusion of the evidence and renewed in writing following the trial pursuant to Fed. R. Crim. P. 29(c). I R. (00-2078), Doc. 126; I R. (99-2328), Doc. 128. Again, the court denied the motions. I R. (00-2078), Doc. 136.

## Discussion

A. Mr. Chino's and Ms. Vallo's Insufficient Evidence Claims

Both Mr. Chino and Ms. Vallo argue that there is insufficient evidence to support their convictions for second-degree murder. We review the record de novo when reviewing both the sufficiency of the evidence to support a conviction and the denial of a motion for judgment of acquittal. United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000). We must determine whether "viewing the evidence in the light most favorable to the government, any rational trier of fact

8

could have found the defendant guilty of the crime beyond a reasonable doubt." Id.; accord Jackson v. Virginia, 443 U.S. 307, 319 (1979). We must not weigh conflicting evidence or consider the credibility of the witnesses, but simply "determine whether [the] evidence, if believed, would establish each element of the crime." United States v. Evans, 42 F.3d 586, 589 (10th Cir. 1994) (quoting United States v. White, 673 F.2d 299, 301-02 (10th Cir. 1982)); see also Jackson, 443 U.S. at 319 ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). If the government has met this standard, we must defer to the jury's verdict. Evans, 42 F.3d at 589.

Second-degree murder is the "unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a); see also Wood, 207 F.3d at 1228. Second-degree murder's malice aforethought requirement can be satisfied by: "(1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; (3) depraved-heart; or (4) commission of [certain felonies]." Wood, 207 F.3d at 1228 (alteration in original) (internal quotations and citations omitted). The existence of a "depraved heart" may be established "by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a

nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." Id. (internal quotations and citations omitted).

The following evidence in the government's case-in-chief supports Mr. Chino's conviction: (1) he had assaulted Zachary in the past -- hitting him, shaking him, and throwing him into the wall; (2) he was "enraged" when he left work at 4 p.m. on July 25, 1998; (3) he arrived at home around 6:15 p.m. on July 25 and found Zachary lying on the floor; (4) he admitted that he shook Zachary at that time; [2] (5) expert medical testimony established that the bleeding around Zachary's retinas could only have been caused by a "violent kind of a shaking" that occurred no more than forty-eight hours prior to his death on July 27, 1998; and (6) the cause of death was "a combination of shaking and blunt force trauma." This evidence is sufficient. We are sensitive to the fact that a conviction must not be obtained simply "by piling inference upon inference." United States v. Rahseparian, 231 F.3d 1257, 1262 (10th Cir. 2000) (quoting United States v. Fox, 902 F.2d 1508, 1513 (10th Cir. 1990) (internal quotations

---

[2] Roger Black, the FBI agent who interviewed Mr. Chino, testified that Mr. Chino admitted that he shook Zachary when he arrived home on the evening of July 25th. After Mr. Chino read Mr. Black's written statement about the contents of that interview, Mr. Chino wanted the word "gently" inserted in the sentence that said he had shaken Zachary. Tr. at 422. Whether or not Mr. Chino "gently shook" Zachary clearly is an issue for the jury and outside our standard of review. Evans, 42 F.3d at 589.

and citations omitted)).  Here, however, we find that a rational jury, drawing reasonable inferences from basic facts to ultimate facts, could have found Mr. Chino guilty of the unlawful killing of Zachary Vallo with malice aforethought by evidence of conduct that was reckless and wanton, and a gross deviation from a reasonable standard of care.

Ms. Vallo was convicted of aiding and abetting the murder.  Because Ms. Vallo testified in her own defense, we may consider the entire record when determining the sufficiency of the evidence.     United States v. Lazcano-Villalobos , 175 F.3d 838, 844 n.3 (10th Cir. 1999).     Rule 29 of the Federal Rules of Criminal Procedure was amended in 1994 to state that "[i]f the court reserves decision [on a motion for judgment of acquittal], it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  In Mr. Chino's and Ms. Vallo's cases, however, the district court did not reserve, but denied their motions for acquittal at the close of the government's case.  In accordance with Rule 29(c), these motions were then renewed in writing within seven days after the jury returned its guilty verdicts.

Prior to the 1994 amendments, a defendant whose motion for judgment of acquittal was denied at the close of the case-in-chief faced the dilemma of resting without putting on evidence and risking conviction in order to preserve the issue for appeal, or putting on a defense and risking filling in the gaps of the

11

government's case. In most jurisdictions, putting on a defense after a motion for judgment of acquittal was considered a waiver of the right to appeal the denial of the motion made before such defense. Both the district and appellate courts could consider the entire record when determining the sufficiency of the evidence, rather than just the case-in-chief. James W. Moore et al., 26 MOORE'S FEDERAL PRACTICE § 629.03[4] (3d ed. 1997). The effect of the 1994 amendments on this waiver doctrine is unclear. Compare 26 MOORE'S FEDERAL PRACTICE § 629.03[4] (indicating that the 1994 amendments do not affect the doctrine of waiver and that if the court denies the motion for judgment of acquittal at the close of evidence and the defense puts on a case, the courts may consider the entire record when considering the sufficiency of the evidence), with Charles Alan Wright, 2A FEDERAL PRACTICE AND PROCEDURE § 463, at 289 (3d ed. 2000) (stating that the 1994 amendments "put an end to the waiver doctrine").

In this circuit, we are bound by our decision in United States v. Lazcano-Villalobos, 175 F.3d 838, 844 n.3 (10th Cir. 1999). In support of the proposition that when a defendant testifies on his own behalf, the court may consider the entire record in ruling on a renewed motion for acquittal at the close of all the evidence, Lazcano-Villalobos cites to United States v. Alejandro, 118 F.3d 1518, 1521 (11th Cir. 1997). In Alejandro, the court noted that when a defendant offers any rebuttal evidence to the government's case-in-chief, not just his own

testimony, that the defendant has waived any objections to the court's denial of his Rule 29 motion. 118 F.3d at 1521. However, Alejandro only cites to pre-1994 amendment cases to support this proposition and does not explicitly discuss the 1994 amendments to Rule 29. Whether Alejandro takes into account the 1994 amendments to Rule 29 is unclear.

Regardless, we apply Lazcano-Villalobos. A panel must follow earlier precedent. Thus, we consider the entire record when determining the sufficiency of the evidence in Ms. Vallo's case as she testified in her own defense.[3]

18 U.S.C. § 2 states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." To be guilty of aiding and abetting, "the defendant must willfully associate [her]self with the criminal venture and seek to make the venture succeed through some action of [her] own." United States v. Whitney, 229 F.3d 1296, 1303 (10th Cir. 2000) (quoting United States v. Anderson, 189 F.3d 1201, 1207 (10th Cir. 1999)).

The following evidence supports Ms. Vallo's conviction: (1) she was aware of Mr. Chino's abuse of her young son and did nothing to stop it; (2) she witnessed an incident of Mr. Chino abusing Zachary and told her son Joseph to

---

[3] In Mr. Chino's case, this issue is moot as we found sufficient evidence in the government's case-in-chief to sustain Mr. Chino's conviction for second-degree murder.

ignore the sounds of the abuse; (3) on the day Zachary was taken to the hospital, she admitted she pushed Zachary out of a chair twice, both times resulting in Zachary landing on his head; and (4) expert medical testimony at trial established that Zachary died from "a combination of shaking and blunt force trauma." This evidence is sufficient. Not only did Ms. Vallo do nothing to stop Mr. Chino's abuse of her son, but she actively participated in the abuse that resulted in her son's death.

B. Ms. Vallo's Prosecutorial Vindictiveness Claim

Next, we address Ms. Vallo's claim that the district court should have dismissed the second-degree murder count based upon prosecutorial vindictiveness. We review the district court's factual findings for clear error and the "legal principles which guide the court de novo." United States v. Lampley, 127 F.3d 1231, 1245 (10th Cir. 1997) (citing United States v. Raymer, 941 F.2d 1031, 1039 (10th Cir. 1991)).

To establish a claim of prosecutorial vindictiveness, Ms. Vallo must prove either "(1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness." Lampley, 127 F.3d at 1245 (citing United States v. Goodwin, 457 U.S. 368, 376, 380-81, 384 & n.19 (1982)). If the defendant is successful in meeting this burden, the prosecution must "justify its decision with legitimate, articulable, objective reasons."

14

Raymer , 941 F.2d at 1040 (citations omitted).

In this case, Ms. Vallo has brought forth no evidence of actual vindictiveness, but argues that there was a realistic likelihood of vindictiveness in the actions of the government.  Aplt. Br. (99-2328) at 17-18.  Ms. Vallo's basic argument is that because she did not tell the government what it wanted to hear during the two debriefing sessions, the government retaliated by charging her with second-degree murder.    Id. at 14, 17;  see also  IX (99-2238) at 18 (Feb. 3, 1999 Hr'g Tr.) ("[S]he's being punished because she chose not to follow through with the plea offer, because she didn't give them what they wanted to hear on Mr. Chino.  I'm submitting to the Court the government is singling her out and punishing her because she's not taking a plea bargain.").

The Supreme Court has "generally rejected the presumption of prosecutorial vindictiveness in the pretrial context."    Lampley , 127 F.3d at 1245 (citing  Goodwin , 457 U.S. at 381-84).  "[I]n the 'give-and-take' of plea bargaining, there is no . . . element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer."    Bordenkircher v. Hayes , 434 U.S. 357, 363 (1978).  "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion."    Id. at 364.

15

The record does not support Ms. Vallo's claim. She and the government entered into plea negotiations. Before beginning a debriefing, Ms. Vallo, her attorney, and the government signed a debriefing agreement which stated that "the Government will not offer in evidence on its case-in-chief, or in connection with any sentencing proceeding . . . , any statements made by [Ms. Vallo] at the meeting . . . ." Aplee. Br. (99-2328) at 40 (debriefing agreement). The government complied with this promise. IX R. at 13 (Feb. 3, 1999 H'rg Tr.). At the evidentiary hearing on the motion, the government proffered that it received new expert medical testimony that indicated Ms. Vallo's actions had helped cause Zachary's death. Id. at 6-7. In addition, it argued that it had doubts as to Ms. Vallo's veracity during the debriefing sessions. Id. at 11. Based on these plausible factors, the government explained its charging decision and the district court did not err in rejecting the prosecutorial vindictiveness claim.

C. Ms. Vallo's Sentencing Claim

Finally, Ms. Vallo argues that the district court erred in not granting her a downward adjustment in her sentence for acceptance of responsibility under U.S.S.G. § 3E1.1 (1998). We review the district court's application of the Sentencing Guidelines de novo and the district court's factual determinations for clear error, "giving due deference to the district court's application of the guidelines to the facts." United States v. Patron-Montano, 223 F.3d 1184, 1188

16

(10th Cir. 2000). "A district court's factual finding is clearly erroneous only if it is without factual support in the record or if [this] court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." Id. at 1188 (internal quotations and citation omitted).

Ms. Vallo argues that she made a "timely, complete, and inculpatory confession admitting that she had pushed her child off a chair" and that she "has never tried to minimize" her actions. Aplt. Br. (99-2328) at 26. However, the district court found otherwise, stating "[s]he did admit to generally tapping his crib or chair and pushing him over but I don't think that constitutes acceptance of responsibility for what happened to him, or for the conduct that resulted in his death. Sent. Tr. (99-2328) at 7 (Nov. 3, 1999). The district court did not clearly err in denying Ms. Vallo a downward adjustment for acceptance of responsibility.

AFFIRMED.