**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 27 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

    v.

RAYMOND JONES,

       Defendant-Appellant.

No. 00-2468

D. New Mexico

(D.C. No. CR-97-478-LH)

---

**ORDER AND JUDGMENT** [*]

---

Before **HENRY** , **BALDOCK** , and **MURPHY** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.    See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The cause is therefore ordered submitted without oral argument.

Raymond Jones  appeals from his conviction after a jury trial of second degree homicide under 18 U.S.C. §§ 1153, 1111, and 2.  On appeal, Mr. Jones contends: (1) the evidence was insufficient to convict; (2) the government's

---

[*]  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

closing argument contained inflammatory statements that affected his substantial rights; (3) the trial court erred when it admitted two items of evidence; (4) the government struck all Native American venire persons, in violation of Batson v. Kentucky, 476 U.S. 79 (1986); and (5) he is entitled to reversal on the basis of cumulative error. We exercise jurisdiction under 18 U.S.C. § 1291 and, for the reasons set forth below, we affirm.

## I. BACKGROUND

This court vacated Mr. Jones' first conviction for second degree murder because the trial court had erred in refusing to give Mr. Jones and his codefendant an instruction on involuntary manslaughter. See United States v. Yazzie, 188 F.3d 1178, 1184-87 (10th Cir. 1999). Mr. Yazzie subsequently pleaded guilty to involuntary manslaughter and Mr. Jones proceeded to trial. Because many of the relevant uncontested facts in this case are recounted in our previous decision, we need only summarize them here.

Thomas Briggs lived in Low Mountain, Arizona. On June 26, 1997, Mr. Briggs, nicknamed "Eagle," and his friend Jerome Begay, set off to Shiprock, New Mexico, after consuming a significant amount of alcohol. Mr. Begay hoped to purchase parts for his vehicle, and Mr. Briggs planned to pawn a watch so that he might purchase groceries. En route the two men stopped at two bars in Farmington, New Mexico.

Mr. Briggs called himself a biker.  He had previously ridden with a group called the Banditos, and thought some other bikers might be in the Shiprock area. He made inquiries about "Turtle," a nickname for Mr. Jones, who was a biker Mr. Briggs knew while he was in prison.

At the Zia Bar in Shiprock, while Mr. Begay remained in the car, Mr. Briggs met several people, and he mentioned to them he was looking to "party." He asked about Turtle specifically.  When Brenda Charley discovered Mr. Briggs was looking for Turtle, she telephoned Mr. Jones.  Ms. Charley told Mr. Jones that a big man with tattoos was asking for a biker named Turtle.  Ms. Charley told Mr. Jones that Mr. Briggs could be found at the Zia Bar.

At the time, Mr. Jones had been preparing to depart on a road trip with  his friend, Alfred Yazzie.  Mr. Jones, who headed up a local biker club called the Norbanos,  proceeded to the Zia Bar on the way out of town.

Mr. Briggs met several other patrons at the Zia Bar, including Curtis Benally and Nolan Charley.  Mr. Charley thought Mr. Briggs might want to meet his cousin-brother, Harrington Blueeyes, who was a biker and a was a "hang-around" member of the Norbanos club.  They left the bar in Mr. Begay's car, with Mr. Begay driving, to find Mr. Blueeyes.  First they went to Mr. Charley's house, where he picked up his vehicle.  They proceeded to the parking lot of a Seven-Eleven, where Mr. Charley told them to wait while he went to awaken Mr.

Blueeyes, who was asleep in his nearby trailer. Initially, Mr. Blueeyes did not want to accompany Mr. Charley to the parking lot to "party" with Mr. Briggs.

Meanwhile, approximately twenty to thirty minutes after Mr. Briggs had departed, Mr. Jones arrived at the Zia Bar. After speaking with several customers, he learned that Mr. Briggs had left with Mr. Charley and headed for Mr. Blueeyes' trailer. Mr. Jones, accompanied by his girlfriend and Mr. Yazzie, proceeded to Mr. Blueeyes' trailer. There, Mr. Jones learned that Mr. Briggs was waiting at the Seven-Eleven parking lot, and he convinced Mr. Blueeyes to accompany him there.

Mssrs. Charley and Blueeyes rode together, followed by Mr. Jones and his two companions. As the cars arrived at the parking lot, the lights from Mr. Begay's car flashed. Mr. Briggs, who was 6' and weighed 280 pounds, emerged from his car, and, while about five feet from Mr. Blueeyes, reached to shake his hand. Before the two shook hands, Mr. Briggs was struck. Mr. Begay, who was reclined in the passenger seat, heard noises akin to wrestling and the sound of bones cracking. Mr. Begay pushed the car horn until Mr. Blueeyes commanded him to stop.

Mr. Begay, drunk and disoriented, soon contacted the police. An FBI agent who examined the crime scene found Mr. Briggs' body face down on the asphalt.

He found no weapon near the body. Blood was spattered on the hood and driver's side of Mr. Begay's car.

Mr. Jones, after receiving his Miranda warnings, admitted to striking Mr. Briggs with a baseball bat. At trial, he gave the following account of the assault on Mr. Briggs: He had interpreted Ms. Charley's telephone call as a warning, and was suspicious of Mr. Briggs' intentions. Mr. Benally had warned him earlier about Mr. Briggs and said that Mr. Briggs was carrying a pistol in his back pocket. See Rec. vol. V, at 549. When Mr. Jones went to meet Mr. Briggs in the parking lot, he was concerned because Mr. Begay's vehicle was parked in darkened section of the lot. Mr. Yazzie, who was partially blind, got out and proceeded toward Mr. Charley's vehicle. Mr. Jones decided to join him and he grabbed what he thought was his flashlight from the bed of his truck. He approached from behind Mr. Begay's car, circling behind Mr. Briggs. Mr. Jones spotted a black object in Mr. Briggs' back pocket, which he thought was a firearm. Mr. Jones heard Mr. Briggs curse and heard a skirmish begin between Mssrs. Briggs and Yazzie. When Mr. Briggs appeared to reach for the firearm, Mr. Jones felt compelled to disable Mr. Briggs. He proceeded to strike him multiple times with the bat, inflicting wounds to the head and back.

Mr. Yazzie also testified at trial. He said that, although he did not recall doing so, he guessed that he slashed Mr. Briggs three times.

Mssrs. Jones and Yazzie departed the scene and drove toward Arizona. Mr. Yazzie threw the knife out the window as they drove; the bat was never recovered.

A grand jury indicted Mssrs. Jones and Yazzie for second degree murder and aiding and abetting second degree murder on an Indian Reservation, in violation of 18 U.S.C. §§ 1153, 1111, and 2 and a jury convicted both defendants. After we vacated those convictions (because an involuntary manslaughter instruction should have been given), Mr. Yazzie entered a plea agreement and Mr. Jones proceeded to trial. A jury again found him guilty of second degree murder. The court sentenced him to 168 months' imprisonment and five years supervised release and ordered him to pay restitution of $2,441.00.

.

## II. DISCUSSION

**A. Sufficiency of the Evidence**

We review de novo both the sufficiency of the evidence and the denial of the motion for judgment of acquittal. United States v. Magleby, 241 F.3d 1306, 1311 (10th Cir. 2001). In reviewing the sufficiency of the evidence claim, we "ask only whether taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find [the defendant] guilty beyond a

-6-

reasonable doubt." Id. at 1311-12 (internal quotation marks omitted). "We must not weigh conflicting evidence or consider the credibility of the witnesses, but simply determine whether the evidence, if believed, would establish each element of the crime." United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir.) (internal quotation marks omitted), cert. denied, 121 S. Ct. 2205 (2001).

Section 1111(a) defines second degree murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). To establish malice aforethought, the government must present proof of: "(1) intent–to–kill without the added ingredients of premeditation and deliberation; (2) intent–to–do–serious–bodily–injury; (3) depraved–heart; or (4) [killing during the] commission of certain felonies." Vallo, 238 F.3d at 1247 (internal quotation marks omitted). The existence of a "depraved heart" may be established "by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." Id. (internal quotations and citations omitted).

Mr. Jones challenges only the evidence presented on the elements of the unlawfulness of the killing and malice aforethought. He notes that the following evidence undermines these elements: (1) Mr. Yazzie thought the flashing of headlights was signaling others in the parking lot; (2) Mr. Jones believed Mr.

Briggs was armed; (3) Mr. Begay was parked in the darkest part of the parking lot; (4) Mr. Jones worried as to why Mr. Briggs was interested in meeting him and his friends, members of a rival biker group; (5) upon seeing Mr. Briggs waiting to meet Mr. Yazzie, his partially blind friend, Mr. Jones worried for Mr. Yazzie's safety; (6) Mr. Jones intended to grab his large flashlight from the truck bed, but grabbed an aluminum bat instead; (7) Mr. Jones used the bat only in his own self-defense and in the defense of others and reacted in the heat of passion.

We are not persuaded by Mr. Jones' arguments. As the government notes, it presented the following evidence to support Mr. Jones' conviction: (1) upon receiving the phone call from Brenda Charley, Mr. Jones proceeded to the Zia Bar, Mr. Blueeyes' trailer, and the Seven-Eleven parking lot in an effort to locate Mr. Briggs; (2) Mr. Benally testified he never told Mr. Jones that Mr. Briggs had a weapon; (3) Mr. Jones carried an aluminum bat while approaching Mr. Briggs; (4) Mr. Jones repeatedly inflicted severe blows upon Mr. Briggs' head, back, and right ankle area with the bat; (5) the cause of death was grievous and massive head injuries produced by a blunt instrument. We conclude that this evidence is sufficient for a rational jury, drawing reasonable inferences from basic facts to ultimate facts, to have found Mr. Jones guilty of the unlawful killing of Mr. Briggs with malice aforethought by engaging in conduct that was "reckless and wanton, and a gross deviation from a reasonable standard of care." Vallo, 238

F.3d at 1247 (explaining evidence necessary to support a finding that the defendant acted with a "depraved heart").

**B. Prosecutor's Remarks**

Next, Mr. Jones contends that several of the prosecutor's statements during closing argument went outside the record and made illegitimate insinuations about Mr. Jones' character and unfairly prejudiced him   First, the prosecutor commented that when Mr. Jones and others approached Mr. Briggs, it was "sort of like wolves around a wounded calf."  Rec. vol. VI, at 761.  Second, the prosecutor also suggested that Mr. Jones had kicked Mr. Briggs in the groin "in the last degrading moment."  Id. at 800.  Finally, the prosecution liberally incorporated Mr. Jones' statement that he was overcome by adrenalin, an "extra source of power where [he] had no control over [his] actions," id. vol. V, at 566, and remarked that Mr. Jones must have been overcome by "one heck of a rush" from his "crushing of flesh and bones."  Id. vol. VI, at 802.  Mr. Jones did not object to the "sort of like wolves" comment but did object to the latter two comments.  Both objections were overruled.

Prosecutors may not obtain jury verdicts by making statements that are seriously misleading or that otherwise prevent the jury from deliberating rationally about the defendant's guilt.  See Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (considering whether the prosecutors' comments "so infected the

trial with unfairness as to make the resulting conviction a denial of due process");

Darden v. Wainwright, 477 U.S. 168, 181 (1986) (noting "is not enough that the

prosecutors' remarks were undesirable or even universally condemned"). Absent

an objection, we review a prosecutor's remarks during closing argument for plain

error and will reverse "only to correct particularly egregious errors. . . ." United

States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986) (internal quotation marks

omitted). When the defendant has objected–but has not moved for a mistrial–we

consider whether the prosecutor's alleged misconduct is harmless. United States

v. Meienberg, 263 F.3d 1177, 1180 (10th Cir. 2001) ("[T]he prosecutor's

improper statement to the jury is harmless unless there is reason to believe that it

influenced the jury's verdict."). "In assessing whether the misconduct had such

an impact, we consider the trial as a whole, including the curative acts of the

district court, the extent of the misconduct, and the role of the misconduct within

the case . . . . To warrant reversal, the misconduct must have been flagrant

enough to influence the jury to convict on grounds other than the evidence

presented." Id. (internal quotation marks omitted).

The prosecutor's statement that Mssrs. Jones and Yazzie acted like "wolves

around a wounded calf," Rec. vol. VI, at 761,was possibly improper, as it sought

to invoke an emotional reaction from the jurors. However, we hold it was not

plain error because it clearly did not so infect the trial so as to deprive Mr. Jones

-10-

of a fair trial. The Supreme Court has condemned similar references, but has not held them to be a violation of due process. See Darden, 477 U.S. at 181-82 (holding that prosecutor's calling defendant, an "animal" who should be on a "leash" not to be in violation of due process). There is no indication that the prosecutor's comment, although objectionable, interfered with the jury's deliberations concerning Mr. Jones' guilt.

Similarly, the prosecutor's suggestion that Mr. Jones, not Mr. Yazzie, kicked the victim in the groin was improper. Mr. Yazzie testified that he kicked the victim towards the groin area. See Rec. vol. VI, at 650. The prosecution suggested that because Mr. Yazzie did not know whether or not he "connected" with the kicking motion, Mr. Yazzie could not have delivered the injury. See id.; id. at 675; 800. At closing, the prosecutor stated "[y]ou know who kicked [Mr. Briggs] in the groin . . . . [i]t was Raymond Jones." Id. at 800.

Nevertheless Mr. Jones does not contend that the trial court misinstructed the jury regarding the weight to be placed upon the closing arguments. Moreover, we hold that the evidence before the jury concerning Mr. Jones' guilt was weighty enough to support his conviction without consideration of the groin injury. Accordingly, the suggestion that Mr. Jones inflicted the groin injury "did not manipulate or misstate the evidence, nor did it implicate other specific rights of

the accused" so as to deprive Mr. Jones of his right to due process. <u>Darden</u>, 477 U.S. at 169.

Mr. Jones' challenge to the prosecutor's reference to Mr. Jones' use of the word "adrenalin" is similarly unpersuasive. The prosecutor suggested that Mr. Jones must have enjoyed "one heck of a rush" while "crushing [Mr. Briggs'] flesh and bones." Rec. vol. VI, at 802. In our view, the objectionable content may have been invited by Mr. Jones' testimony that he was overwhelmed by adrenalin and could not control his actions. Assuming without deciding that the prosecutor's closing contained unprofessional and inappropriate references, Mr. Jones cannot show prejudice in the face of the overwhelming evidence of his guilt.

**C. Admission of evidence**

Mr. Jones contends that the district court erred when it admitted into evidence a photograph of the victim and the plea bargain of his former co-defendant, Mr. Yazzie. Mr. Jones objected only to the admission of the photograph. "We review the district court's rulings on the admission of evidence for abuse of discretion, if an objection is timely made, and otherwise for plain error. <u>Magleby</u>, 241 F.3d at 1315.

1. Photograph of Victim

The trial court admitted into evidence a photograph of the victim with his mother, taken approximately five years before his death. In support of its admission, the prosecution contended that Mr. Jones placed the appearance of the victim into dispute, through testimony that suggested Mr. Briggs was "scary." Rec. vol. IV, at 246 (testim. of Brenda Charley); vol. V, at 538 (testim. of Mr. Jones). Mr. Jones objected to the photograph's admission and stipulated to the identity of the victim.

We note that "[t]he trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed." United States v. Joe, 8 F.3d 1488, 1499 (10th Cir. 1993) (internal quotation marks omitted). We acknowledge that in Joe the defense did not stipulate to the identification of the victim, and that here the photograph is not probative of the victim's identity. However, we agree with the government that the photograph was relevant to the disputed appearance of the victim. Moreover, the photographs were not unfairly prejudicial. Cf. United States v. Naranjo, 710 F.2d 1465, 1468 (10th Cir. 1983) (admission of photograph depicting entry wound at the right upper lip of victim, "and a great deal of blood on the pillow, bedsheets, and the victim's face" was not "unduly nor designedly inflammatory" and the jury was not improperly prejudiced by it). However, we must admonish

the government, as we did with reference to its choice of closing words, to select its exhibits carefully. The proffering of a five-year old photograph of the victim seated with his mother, as opposed to a more recent (if available) or at least a cropped photograph depicting only the victim, needlessly pushes the prosecutorial envelope, and could, if coupled with errors not present here, jeopardize a conviction.

2. Plea agreement

Mr. Jones also contests the admission of Mr. Yazzie's plea agreement as unfairly prejudicial and as plain error. He contends that the government used the plea agreement as substantive evidence in its closing argument. Mr. Jones did not object to any of the testimony regarding Mr. Yazzie's guilty plea of which he now complains. Nor did he request an instruction regarding the significance of the plea agreement. Thus, we review for plain error. See Fed. R. Crim. P. 52(b); United States v. Osuna, 189 F.3d 1289, 1292 n. 2 (10th Cir. 1999).

Under the plain-error rubric, this court may correct an error not raised at trial only if it is (1) plain, and (2) affects the defendant's substantial rights. See Johnson v. United States, 117 S. Ct. 1544, 1549 (1997). If those conditions precedent are met, this court may exercise its discretion to correct the error only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted).

-14-

Clearly, Mr. Yazzie's "'guilty plea may not be used as substantive evidence of a defendant's guilt.'" United States v. Whitney, 229 F.3d 1296, 1304 (10th Cir. 2000) (quoting United States v. Baez, 703 F.2d 453, 455 (10th Cir. 1983)). "However, either the government or the defense may elicit testimony from a co-defendant regarding his guilty plea for purposes of aiding the jury in its assessment of the co-defendant's credibility as a witness." Id. Finally, the government may use co-defendant's guilty plea "to establish 'the witness's claim to firsthand knowledge based on his or her admitted participation.'" Id. (quoting United States v. Davis, 766 F.2d 1452, 1456 (10th Cir. 1985)).

Here, as Mr. Yazzie testified to the facts related to the killing that were contained in the plea agreement, the government and Mr. Jones used evidence of Mr. Yazzie's plea to inform the jury of the circumstances under which he was testifying and to aid him to recount his knowledge of the offense. This was a proper use of a Mr. Yazzie's guilty plea. See id. There was no plain error here.

**D. Batson claim**

For the first time on appeal, Mr. Jones alleges that the prosecution improperly struck two Native American venirepersons, in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Because Mr. Jones failed to raise this objection at any point below, we review for plain error only. See Hidalgo v. Fagen, Inc. 206 F.3d 1013, 1019-20 (10th Cir. 2000) (reviewing Batson challenge raised for the

first time on appeal for plain error); cf. Morning v. Zapata Protein (USA), Inc., 128 F.3d 213, 216 (4th Cir. 1997) (noting that Batson challenge must be exercised in a timely manner, and failure to raise a Batson challenge prior to the venire being excused constitutes a waiver of the challenge).

"Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." Heno v. Sprint/United Management Co., 208 F.3d 847, 854 (10th Cir. 2000).

However, without a timely challenge, Mr. Jones cannot establish a prima facie case of racial discrimination under Batson. See Hidalgo, 206 F.3d at 1020 (finding no plain error where claim not raised below). There is no evidence in the record to support his assertion that the persons removed via the government's peremptory challenge were Native American. Additionally, Mr. Jones has failed to show that the government's use of peremptory challenges in removing the two prospective jurors was motivated by anything other than a racially neutral reason. Mr. Jones does not direct us to any facts in the record from which we can infer a discriminatory purpose on the part of the prosecution. See United States. v.

Bedonie, 913 F.2d 782, 795 (10th Cir. 1990) (concluding that the defendant failed to show that the persons removed were members of his racial group or that the government's challenges were racially motivated). A remand to the district court at this juncture would be impractical and improper. See United States v. Allen, 666 F. Supp. 847, 856 (E.D. Va. 1987) (when Batson claim was raised when jury was not yet impaneled, the trial was about to begin, and all of the unselected veniremen had been released, the court noted: "In this and most other jurisdictions, jury costs have risen, and it is impractical to have a venire of 36 to 50 persons called and paid only to have them excused, and a new venire called, just because the defense counsel has not made a timely objection."), aff'd sub nom. United States v. Harrell, 847 F.2d 138 (4th Cir. 1988).

**E. Cumulative Error**

Finally, Mr. Jones maintains that even if these errors do not rise to the level of reversible error, in the aggregate, they amount to cumulative error. However, we hold that we need not engage in a cumulative error analysis as requested by Mr. Jones. When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated. See United States v. Rivera, 900 F.2d 1462, 1470-71 (10th Cir. 1990) (en banc) ("[A] cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").

Because we have found but one potential error, which we deemed harmless, resulting from the alleged prosecutorial misconduct, the cumulative error doctrine does not apply.

## III. CONCLUSION

For the reasons stated above we AFFIRM Mr. Jones' conviction.

Entered for the Court


Robert H. Henry
Circuit Judge