**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee/Cross-Appellant,

v.

CHRISTOPHER A. BROWN,

    Defendant-Appellant/Cross-Appellee.

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee/Cross-Appellant,

v.

RAYMOND A. BARNES,

    Defendant-Appellant/Cross-Appellee.

No. 15-7018 & 15-7030

(D.C. No. 6:13-CR-00017-RAW-2)
(E. D. Okla.)

No. 15-7020 & 15-7029

(D.C. No. 6:13-CR-00017-RAW-1)
(E. D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE, LUCERO** and **McHUGH**, Circuit Judges.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Raymond Barnes, former Jail Superintendent of the Muskogee County Jail (MCJ), appeals his conviction of conspiring to deprive inmates of the "free exercise and enjoyment of rights and privileges secured to them by the Constitution of the United States," in violation of 18 U.S.C. § 241, and also willfully depriving inmates of their "right, protected and secured by the Constitution and laws of the United States, not to be subjected to cruel and unusual punishment," in violation of 18 U.S.C. § 242. ROA Vol. I at 32, 35. Christopher Brown, former Assistant Jail Superintendent, was convicted of the same crimes, as well as making a false statement to a federal agent in violation of 18 U.S.C. § 1001. Defendants appeal their convictions, challenging the admissibility of certain evidence, the sufficiency of the evidence, and certain jury instructions. On cross-appeal, the government challenges the procedural and substantive reasonableness of Defendants' sentences. We affirm Defendants' convictions, vacate their sentences for procedural unreasonableness, and remand for resentencing.

I

*Background*

After an investigation into allegations that inmates were being physically abused at MCJ, Defendants were charged in a four count indictment. Count 1 charged both Defendants with conspiring to specifically deprive inmates of their right to due process and to be free from cruel and unusual punishment, in violation of 18 U.S.C. § 241. The indictment alleged that Defendants directly assaulted inmates, ordered subordinates to assault inmates, threatened to fire subordinates who reported abuse, required subordinates

2

to falsify use-of-force reports, and generally cultivated an abusive environment at MCJ. The indictment further described seven overt acts taken in furtherance of the conspiracy: four "Meet and Greets" orchestrated by Defendants at MCJ, wherein inmates transferred from other counties were thrown to the ground while in restraints, although the inmates posed no physical threat, as well as three other incidents of Defendants directly abusing inmates. Counts 2 and 3 charged both Defendants with depriving two inmates, Jace Rice and Gary Torix, of their right to be free from cruel and unusual punishment by orchestrating violent "Meet and Greets" when they were transferred to MCJ, in violation of 18 U.S.C. § 242. Count 4 charged Brown with making a false statement to an FBI agent, in violation of 18 U.S.C. § 1001, by stating that inmates were "gently placed" on the ground during "Meet and Greets."

## A.    *"Meet and Greets"*

During Defendants' week-long joint trial, the government called nineteen witnesses, and Defendants called none. The testimony focused primarily on the four "Meet and Greets" alleged in the indictment. Evidence of the first two "Meet and Greets" support the substantive counts; all four support the conspiracy counts.

### 1.    *Jace Rice (Counts 1 and 2)*

Prior to the arrival of Jace Rice, Barnes instructed two jailers to pull Rice out of the van and ensure that "the first thing that touched the ground [was] his head." ROA Vol. II at 1442. After the van arrived at MCJ, Rice was described as "calm" and had a belly chain around his waist, which went through his handcuffs and connected to shackles

3

on his ankles.  Id. at 1360, 1443.  Rice was forcibly removed from the van and, unable to brace himself due to the restraints, landed head-first on the concrete after falling roughly five feet.  Two jailers testified that when Rice's head hit the concrete "[i]t sounded like a watermelon hitting the ground."  Id. at 1361, 1748.  Three to ten officers then piled on top of Rice.  They began "pulling and twisting" him allegedly for the purpose of removing the restraints which belonged to the transferring facility, and replacing them with MCJ restraints.  Id. at 1364, 1446, 1749.  Once the restraints were switched out, Rice was "picked up and carried into the jail," "[p]arallel to the floor, like a ladder, face down, feet first."  Id. at 1367, 1448, 1750.  Barnes then welcomed Rice to MCJ and warned Rice that if he acts up, "what just happened to [him] will happen to [him] again or even worse."  Id. at 1369.  Rice had a "knot," a "cut" and/or a "red bump" on his head after the "Meet and Greet."  Id. at 1369, 1451, 1750.  Brown was present at this "Meet and Greet."

### 2.  Gary Torix (Counts 1 and 3)

Prior to the arrival of Gary Torix, Barnes gathered several jail employees to tell them "they had an inmate coming in from Cherokee County" who was "one of the bad boys," that "they were going to show him how things were run in Muskogee County," and that the inmate had staples in his head from a prior injury.  Id. at 1870.  Torix was "calm" and in shackles and handcuffs when he arrived.  Id. at 1373, 1536.  It is unclear whether Torix stepped out of the vehicle by himself or if he was removed from it, but he was ultimately forced face-first to the ground, which was part concrete and part gravel.  After hitting the ground, Torix's head was bleeding, and he was "screaming" and

4

"thrashing around." Id. at 1537, 2080. As many as fifteen people piled on top of him to switch out his restraints. Torix was then carried "face-down" into the jail, where Barnes introduced himself and informed Torix that he (Barnes) "run[s] this jail" and that "[i]f [Torix] gives [MCJ officers] any problems, what just happened will happen or possibly even worse." Id. at 1376, 1876. An hour after booking Torix, medical staff went to check on him: he was still bleeding from his prior larceration, which had reopened, his glasses were scuffed, and he had "road rash on his forehead." Id. at 2081.

### 3.    Herbert Potts and Riley Starr (Count 1)

In support of the conspiracy charge, witnesses testified that "Meet and Greets" of two other inmates, Herbert Potts and Riley Starr, followed the same general pattern as those experienced by Rice and Torix. Starr's "Meet and Greet" was unique in one way: his head also hit the door as he was being carried into the jail. Brown was not only present at both "Meet and Greets," but one witness testified that Brown personally grabbed Potts and pulled him to the concrete face-first.

### B.    Other Instances of Abuse (Count 1)

On one occasion when several inmates were lined up outside the medical office, Barnes was asked to come to the area. The jailer who asked that Barnes be called did not testify at trial, but it appears that he believed an inmate was being too loud. When Barnes entered the area, with Brown right behind him, he was visibly upset: "He was bowed up a little and his fists were clenched." Id. at 2069. Without asking who was causing the reported disruption, he immediately approached Jeremy Armstead, who had done nothing

5

wrong. Barnes grabbed Armstead by his shirt collar and either pushed him against a wall or shoved his head down under his arm. Defendants then restrained Armstead and took him to a cell where they placed a helmet on him and made him sit for almost two hours. Armstead suffered a shoulder injury as a result.

On a different occasion, an inmate named Alton Murphy got "mouthy"—but not combative—when Barnes told him to "lock down." Id. at 1453. When Murphy refused to "lock down," things got physical. According to one witness's testimony, Barnes snuck up behind Murphy "and put [Barnes's] arms through [Murphy's] arms and around his head, like a full nelson." Id. at 1454. They fell backward with Murphy landing on top of Barnes, Brown jumped on top of Murphy, and another guard "sprayed everybody with pepperspray." Id. at 1454. According to a different witness, Barnes and Brown both approached Murphy and "hit him simultaneously[: Barnes] hit him on top, [Brown] went and hit him under the legs, and he went to the ground." Id. at 1806.[1]

### C.    Attempts to Cover Up the Abuse (Count 1)

Several former and current employees of MCJ testified that they were afraid that Barnes and Brown would retaliate against them if they reported the inmate abuse. One

---

[1] The final incident alleged in the indictment as an overt act taken in furtherance of the conspiracy involved Barnes and Brown "[striking] and beat[ing] an unidentified inmate who was restrained in a cell in the detox area and not posing a physical threat to anyone." ROA Vol. I at 34. A former jailer, Ashley Mullen, testified about this incident at trial. Finding that Mullen's testimony regarding this incident "was so amorphous that its—its probative value is substantially outweighed [by] the unfair prejudice that it could have on the jury," ROA Vol. II at 2258, the district court instructed the jury to disregard her testimony concerning this unidentified inmate.

jailer testified that Barnes made her "fix reports" that used language that was too vivid in describing the force used, id. at 1804, while several others testified that they reported incidents with such mild language that they felt the reports were inaccurate. Another jailer testified that her shift was twice changed within two days of submitting accurate (but damning) reports. The shift changes were problematic for her because the revised schedules disrupted her child care arrangements. Barnes changed her shift the first time, Brown did so the second time.

### D. Brown's Interview with the FBI (Count 4)

Brown was also charged with making a false statement to FBI Agent Jennifer Chapman. Agent Chapman testified that she asked Brown about "Meet and Greets," which he described as

> when there was an inmate that was out of control at another facility that was going to come and stay at Muskogee County for a period of time. The inmate would come in . . . a police car . . . , pull into the sally port. They were asked to . . . step out of the vehicle first. And once the inmate stepped out, they'd be asked to get on the ground.

ROA Vol. II at 1996–97. She further testified that Brown told her that "if the inmate didn't comply, [MCJ officers] would gently place the inmate onto the ground." Id. at 1997. When she questioned Brown about his use of the phrase "gently placed," he stood by his description.

### E. Procedural History

At the close of the government's case, Barnes moved for a judgment of acquittal, which the district court denied. The jury returned a verdict finding both defendants guilty

7

of Count 1 (conspiracy), and Count 2 (Jace Rice's "Meet and Greet"). The jury also found Barnes guilty of Count 3 (Gary Torix's "Meet and Greet"), and found Brown guilty of Count 4 (false statement). Both Defendants subsequently filed motions for judgment of acquittal and motions for new trial, which the district court also denied. At sentencing, both Defendants sought a downward variance, and specifically requested only supervised release. The court granted downward variances, though not to the extent requested. Although the applicable Guidelines range for each Defendant was 70–87 months, the court sentenced Barnes to twelve months' imprisonment, followed by two years of supervised release, and Brown to six months' imprisonment, followed by three years of supervised release. Defendants appeal their convictions. The government cross-appeals, challenging the reasonableness of Defendants' sentences.

II

*Defendants' Appeals of Their Convictions*

Defendants challenge the admissibility of certain evidence, the sufficiency of the evidence as a whole, and specific jury instructions. We address each challenge in turn, ultimately concluding that Defendants' convictions should be affirmed.

A.      *Admissibility of Testimony Regarding Use-of-Force Training*

Defendants challenge various testimony involving use-of-force training provided to jailers at MCJ. Both argue that although George Roberson, a captain with the Muskogee County Sheriff's Department, testified as an expert, the heightened requirements for expert testimony under Federal Rule of Evidence 702 were ignored.

8

Brown challenges not only Roberson's testimony on this ground, but also the testimony of various jailers. Brown further argues that the jailers' testimony should have been excluded under Rule 403. We review the district court's evidentiary rulings for an abuse of discretion, but review the district court's interpretation of the Federal Rules of Evidence de novo. United States v. Orr, 692 F.3d 1079, 1088 (10th Cir. 2012). Applying this standard, we conclude the district court did not err in admitting the testimony regarding use-of-force training.

### 1.    *Rule 702 Challenge*s

Federal Rule of Evidence 701 sets the boundaries for lay-witness testimony: it must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Expert testimony must meet the heightened requirements of Rule 702. See Fed. R. Evid. 701, 702. Expert testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and "the expert [must have] reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

We consider four factors in determining whether the testimony at issue is lay witness testimony or is, in fact, expert testimony offered as lay testimony. First, we consider whether the testimony meets the requirements of Rule 701 set forth above. James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1214 (10th Cir. 2011). Second, we consider whether the testimony was based on professional experience. Id. at

9

1215. Lay witness testimony can rely on "a limited amount of expertise," so long as the "opinions or inferences . . . could be reached by any ordinary person." Id. at 1214 (quoting United States v. VonWillie, 59 F.3d 922, 929 (9th Cir. 1995), and then quoting LifeWise Master Funding v. Telebank, 374 F.3d 917, 929 (10th Cir. 2004)). A witness who *possesses* "scientific, technical or other specialized knowledge" can testify as a lay witness so long as the testimony *is not based* on such knowledge. See, e.g., Ryan Dev. Co. v. Ind. Lumbermens Mut. Ins. Co., 711 F.3d 1165, 1170 (10th Cir. 2013) (permitting accountants, who "often testify as expert witnesses," to testify as lay witnesses where their testimony involved only basic arithmetic and was based on their personal experience providing services to defendant); Orr, 692 F.3d at 1089–90 (permitting scientists, previously hired by defendant, to testify as lay witnesses regarding the parameters of their duties and what they reported to defendant, avoiding technical evaluation of the project). Third, we consider whether the expert relied on "a technical report by an outside expert." James River, 658 F.3d at 1215. Finally, we consider how the Federal Rules of Evidence generally classify the testimony at issue. Id.

### a.     Roberson's Testimony

Roberson testified that he taught "use of force at jail school," which was "sometimes" attended by Defendants. ROA Vol. II at 2153. He testified that he taught jailers that they could use force "if an inmate was a threat to them [or] aggressive toward them," and that the "overall goal" in using force was "[t]o control the situation, de-escalate it," thus reducing the odds that "someone is going to get hurt." Id. at 2154. He

also testified about a conversation he had with Barnes. According to Roberson's testimony, Barnes "told the employees or the detention officers that if an inmate is in their . . . personal space, . . . they can strike the inmate." Id. at 2155. Roberson then informed Barnes that force would not be necessary or helpful in that situation and would only cause the situation to escalate. Barnes responded by shrugging his shoulders and walking away. Roberson then informed Barnes that "if [use of force] was taught that way, . . . that man in the black suit was going to come knocking on your door. And I don't mean the preacher, I'm talking about the FBI." Id. at 2156.

Defendants did not object to this testimony at trial. The only objection they made was to the use of "hypothetical questions" during Roberson's testimony. Id. at 750. When "[t]he *specific* ground for reversal of [the] evidentiary ruling on appeal" is not "the same as that raised at trial," we review this challenge only for plain error. United States v. Ramirez, 348 F.3d 1175, 1181 (10th Cir. 2003) (emphasis added) (quoting United States v. Norman T., 129 F.3d 1099, 1106 (10th Cir. 1997)). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Hill, 749 F.3d 1250, 1257–58 (10th Cir. 2014).

Applying the only relevant James River factors discussed supra,[2] we conclude that the district court did not err, or at least did not plainly err. First, the testimony meets the

---

[2] The last two factors are not helpful in deciding this case: Roberson did not rely on an outside expert report and there is no standard classification in the Federal Rules of Evidence for this type of testimony. Cf. James River, 658 F.3d at 1215.

requirements of Rule 701: (1) Roberson had personal knowledge of his training of jailers regarding their use of force, and specifically of his conversation with Barnes; (2) his testimony was helpful in determining whether Defendants acted willfully, see United States v. Rodella, 804 F.3d 1317, 1338 (10th Cir. 2015) (concluding that evidence of the official training the defendant received was relevant to show willfulness), petition for cert. filed, Rodella v. United States, No. 15-1158 (Mar. 16, 2016), and willfulness was an element of Counts 2 and 3 alleging violation of 18 U.S.C. § 242; and (3) his testimony was not based on scientific, technical, or other specialized knowledge.

Second, although Roberson's testimony addressed facts known to him as a result of his work experience, it nonetheless was not *based* on technical or scientific knowledge. Although Roberson, as a captain in the Muskogee County Sheriff's Department, arguably had specialized knowledge regarding the appropriate use of force, he did not offer an opinion *based* on that knowledge. Instead, he simply related to the jury two experiences he had while working as a captain in the Muskogee County Sheriff's Department. His testimony was not admitted to establish what level of force is constitutionally permissible (as Defendants contend); it was admitted to show Defendants' willfulness. Cf. Orr, 692 F.3d at 1090 (considering the purpose of testimony in determining whether witness testimony was based on specialized training and experience). The fact that Defendants were present during some of Roberson's training sessions, and that Barnes and Roberson had the conversation detailed above, shows that Defendants were aware that official protocol limited the use of force to instances when an inmate was acting in a threatening

12

manner.  That Defendants disregarded their training on the appropriate use of force is admissible to show that Defendants acted willfully.  See Rodella, 804 F.3d at 1338.

### b.  Jailer Testimony

The government also called several current and former MCJ jailers to testify.  The gist of their testimony was that (1) they attended the Council on Law Enforcement Education and Training (CLEET), a 90-day police training course that discussed the use of force; (2) CLEET taught them to use force only if an inmate poses a threat to safety, and that inmates in restraints pose no such threat; (3) the inmates involved in the "Meet and Greets" at issue in this case were in restraints; and accordingly (4) these "Meet and Greets" were contrary to their training.

Brown argues that the jailers' testimony constituted expert testimony, but did not comply with the heightened requirements of Federal Rule of Evidence 702.  Brown has failed in his obligation to "cite the precise reference in the record where the issue was raised and ruled on."  See 10th Cir. R. 28.2(C)(2).  Our independent search of the record uncovered only objections made by Barnes, and seemingly not joined by Brown.[3]  "[A]n objection by one defendant is not sufficient to preserve the issue for appeal for another defendant, at least when (as is the case here) there is no agreement among the defendants that an objection by one defendant will count as an objection by all defendants."  United States v. Zapata, 546 F.3d 1179, 1190 (10th Cir. 2008).  Accordingly, we consider

---

[3] Barnes does not assert this issue on appeal.

Brown's challenge to the admissibility of the jailers' testimony as lay testimony only for plain error.  See id.

The plain error standard is not met here because the testimony meets the requirements of Rule 701: (1) each jailer had personal knowledge of what they were taught *and* of the "Meet and Greets" they described; (2) their testimony was helpful to the jury in understanding whether Brown acted willfully, see Rodella, 804 F.3d at 1338, a required element of Counts 2 and 3 alleging violation of 18 U.S.C. § 242; and (3) as Defendants noted during trial, a 90-day police training class is hardly the type of "scientific, technical, or other specialized knowledge" contemplated by Rule 702.

Moreover, although the jailers testified about experiences they encountered in their professional capacities, their testimony was not "based on professional experience" as contemplated by Rule 702.  James River, 658 F.3d at 1215.  The jailers simply testified about what they were taught and what they subsequently witnessed: they were taught not to use force when an inmate poses no threat, but they later witnessed force being used on calm inmates who were in restraints and who posed no threat.  Admittedly, some witnesses did go one step further to state that what they observed was inconsistent with what they had been taught.  But even this conclusion "could be reached by an ordinary person" who attended these classes and then later observed the "Meet and Greets."  See LifeWise, 374 F.3d at 929.[4]  The Fourth Circuit reached a similar conclusion in United

---

[4] As with Roberson's testimony, neither of the final two James River factors are helpful in deciding this issue.  The jailers did not rely on an outside expert report, nor is there a standard classification in the Federal Rules of Evidence for this type of testimony.

14

States v. Perkins, 470 F.3d 150, 156 (4th Cir. 2006) (permitting police officers who observed a fellow officer's use of force to testify that the force was unreasonable in light of their experience, concluding that their testimony was "common enough and required such a limited amount of expertise").

### 2. Rule 403 Objection

Brown also argues that the jailers' testimony was "extremely prejudicial because whether the use of force . . . was consistent with the training he or she received at CLEET, misled the jury concerning the standard to be applied." Brown Opening Br. at 49. Brown argues that "[i]nstead of making a decision based upon a finding of wanton and sadistic conduct, the jury appears to have made a decision based upon violation of CLEET standards." Id. Brown did not contemporaneously object to this testimony on Rule 403 grounds. Although Barnes objected on this basis, Brown does not appear to have joined that objection.[5] So once again, we review Brown's challenge only for plain error. See Zapata, 546 F.3d at 1190.

The plain error standard is not met here. Federal Rule of Evidence 403 permits a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Brown argues that the probative value of this testimony is substantially outweighed by the danger that the jury would substitute the

---

[5] Barnes does not assert this issue on appeal.

Eighth Amendment's "wanton and sadistic" standard with what was taught in the CLEET training. We conclude that the value of this testimony—to establish the required element of willfulness—is not substantially outweighed by any harm it would cause. Even if the court's admission of their testimony was error, it likely did not affect the outcome of the trial because the court instructed the jury that CLEET training "does not define the constitutional boundaries by which treatment of inmates is to be judged." ROA Vol. I at 479. Brown has failed to show that the court's admission of this testimony was an error that affected his substantial rights.

## B. Challenges to the Sufficiency of the Evidence

Defendants make separate challenges to the sufficiency of the evidence. Barnes argues that the government was required, but failed, to prove that the inmates involved in the "Meet and Greets" had Eighth Amendment rights. Brown argues that the evidence offered at trial, and not subsequently limited by instruction, is insufficient to show that (1) his statement to Agent Chapman was false, (2) he physically assaulted anyone, (3) he was part of a conspiracy, (4) there was any link between himself and Jace Rice, (5) he acted with the necessary state of mind, and (6) his actions were improper when the deference afforded jailers is considered. We begin by addressing Barnes's challenge to the evidence.

### 1. Barnes's Challenge: Sufficiency of Evidence that Inmates had Eighth Amendment Rights

Counts 2 and 3 of the indictment allege that Defendants willfully deprived Jace

Rice and Gary Torix of their right "not to be subjected to cruel and unusual punishment." ROA Vol. I at 35. The jury instructions also refers to "cruel and unusual punishment" in setting forth the elements of Counts 2 and 3. Id. at 470–71. Barnes argues that these references required the government to also prove that Rice and Torix were convicted inmates who had Eighth Amendment rights, as opposed to pretrial detainees.[6] The government concedes that it did not establish that these inmates had been convicted, but the government also argues that its failure to do so does not warrant reversal of these counts. We agree.

Barnes argued in his appellate brief that the jury instructions, by defining the rights at issue in Eighth Amendment terms, required that the government prove Rice and Torix were convicted inmates. After briefing was complete in this case but before oral arguments, the Supreme Court released Musacchio v. United States, which held "that, when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements

_____

[6] Barnes is correct in noting that because pretrial detainees have not yet been convicted, they "cannot be punished at all," let alone in a cruel and unusual manner. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475 (2015). Accordingly, their Eighth Amendment rights are not implicated. Id. That does not, however, mean that the conditions of a pretrial detainee's confinement are not constitutionally protected; that protection derives instead from the Due Process Clause of the Fourteenth (or Fifth) Amendment. See Estate of Booker v. Gomez, 745 F.3d 405, 418–19 (10th Cir. 2014). Although the constitutional sources of these protections are different, the legal standards are similar. See Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998) ("Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims." (citation omitted)). For our purposes here, we need not flesh out the extent to which the two standards differ.

17

of the charged crime, not against the erroneously heightened command in the jury instruction." 136 S. Ct. 709, 715 (2016). At oral argument, Barnes modified his argument, relying on the indictment's reference to "cruel and unusual punishment" (as opposed to the jury instruction) to require the government to prove Rice and Torix were convicted inmates, a possibility that the Supreme Court left open in Musacchio. Id. at 715 n.2 ("[W]e express no view on the question whether sufficiency of the evidence at trial must be judged by reference to the elements charged in the indictment, even if the indictment charges one or more elements not required by statute."). Barnes concedes that because he did not raise this argument before the district court, it is subject only to plain error review. He nonetheless fails to offer any current, well-settled law that renders the government's failure of proof a "plain error." See United States v. DeChristopher, 695 F.3d 1082, 1091 (10th Cir. 2012) ("An error is plain if it is clear or obvious under current, well-settled law."). The fact that the Supreme Court has not foreclosed the possibility that inclusion of an additional element in an indictment may heighten the government's burden does not establish that it does. Accordingly, we reject Barnes's sufficiency challenge.

### 2. *Brown's Challenges*

As noted above, Brown contends the evidence presented was insufficient to prove that (1) his statement was false, (2) he physically assaulted anyone, (3) he was a part of a conspiracy, (4) there was any link between himself and Jace Rice, (5) he acted with the required state of mind, and (6) his alleged actions are not within the deference afforded

18

jailers. All of these challenges were raised in both his motion for a judgment of acquittal, as well as his motion for new trial. The latter motion suggested the jury's verdict could only be supported if it considered the testimony of jailer Ashley Mullen, which the district court excluded from the jury's consideration. We review each sufficiency challenge in turn, then reconsider each sufficiency challenge after excluding Mullen's testimony.

"We review a district court's denial of a motion for a judgment of acquittal under a de novo standard." United States v. Dewberry, 790 F.3d 1022, 1028 (10th Cir. 2015). We must determine "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000) (quoting United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999)). "We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Dewberry, 790 F.3d at 1028 (quoting United States v. Hale, 762 F.3d 1214, 1222 (10th Cir. 2014)). "We must not weigh conflicting evidence or consider the credibility of the witnesses, but simply 'determine whether [the] evidence, if believed, would establish each element of the crime.'" United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001) (alteration in original) (quoting United States v. Evans, 42 F.3d 586, 589 (10th Cir. 1994)).

"We ordinarily review the denial of a new trial for abuse of discretion."  United

States v. Herrera, 481 F.3d 1266, 1270 (10th Cir. 2007).  In considering a motion for new

trial, the district court "considers the credibility of witnesses and weighs the evidence as a

thirteenth juror."  United States v. Lopez, 576 F.2d 840, 845 n.1 (10th Cir. 1978).  The

district court "does not view the evidence in the light most favorable to the government as

[it] would in ruling on a Rule 29 acquittal motion."  Id.  The motion should be granted

only "if the interest of justice so requires." Fed. R. Crim. P. 33(a).

> a. *Sufficiency of Evidence That Brown's Statement to the FBI Was False*

Brown argues that the evidence was insufficient for a reasonable jury to conclude

beyond a reasonable doubt that his response to Agent Chapman's question was false.  He

notes that Agent Chapman asked him to describe what happened at "Meet and Greets"

*generally*, not what happened at any specific "Meet and Greet."  We view evidence in the

light most favorable to the government, asking whether a reasonable jury could find

Brown guilty beyond a reasonable doubt.  McKissick, 204 F.3d at 1289.

The government cites to the testimony of Jodi Matthews, a former jail employee,

to show that the four "Meet and Greets" described at trial represent the "norm."  After

describing the "Meet and Greet" of Rice, Matthews was asked to describe the "Meet and

Greet" of Torix.  She answered that "[i]t's basically the same routine.  The inmate is

taken out of the vehicle and slammed onto the ground, assuming that this inmate is going

to be combative because he was brought to our facility for that reason."  ROA Vol. II at

20

1575. This testimony shows that the term "Meet and Greets" had become a term of art used at MCJ to describe the specific treatment of inmates who were transferred to MCJ because they were troublemakers. We conclude that the evidence, when viewed in the light most favorable to the government, is sufficient to support the jury's finding that Brown's response to the agent's question was false.

### b. Sufficiency of Evidence That Brown Physically Assaulted Anyone

Brown argues that no credible witness testified that he physically assaulted an inmate or instructed anyone else to do so. That is simply not true. Ashley Mullen, a former jailer at MCJ, testified that during a "Meet and Greet," Brown "grabbed [Herbert Potts] by . . . the front of his jumpsuit and pulled him out on the ground . . . jerk[ing] [Potts] out onto the concrete pretty much face first." Id. at 1922. Although the district court instructed the jury to disregard Mullen's testimony "regarding alleged conduct involving an *unidentified inmate* in the detox area," he did not instruct the jury to disregard her testimony regarding Potts. See ROA Vol. I at 468 (emphasis added). So there is no basis for us to conclude that the jury could not have considered her testimony regarding Pott's "Meet and Greet."[7]

---

[7] Brown also argues that the portion of Mullen's testimony that was admitted is so inherently unreliable that it cannot support his convictions. But it was for the jury to decide whether to believe Mullen. And even if the jury disregarded Mullen's testimony as unreliable, it could have believed Brandi Hoover's account of the incident with Alton Murphy.

21

Additionally, another jailer, Brandi Hoover, testified that Brown and Barnes "hit [Alton Murphy] simultaneously[: Barnes] hit him on top, [Brown] went and hit him under the legs, and he went to the ground." ROA Vol. II at 1806. Brown argues that this testimony is not credible because it differs from the testimony of a fellow jailer, Michael Gray, who testified that Barnes grabbed Murphy "from behind and they went to the floor," with Murphy falling on top of Barnes, and then Brown "jumped on top of them." Id. at 1456. Although these descriptions are inconsistent, they both indicate that Brown physically assaulted Murphy. Even if the distinction were material, it is not our role to determine which witness the jury found more credible. See Vallo, 238 F.3d at 1247 ("We must not weigh conflicting evidence or consider the credibility of the witnesses . . . .").

At bottom, the question becomes whether the evidence presented supports the jury's conclusion that Brown conspired to deprive MCJ inmates of their constitutional rights (Count 1), and that the "Meet and Greet" of Jace Rice deprived Rice of his constitutional rights (Count 2). Physical assault is not a necessary element of either count. See United States v. Conatser, 514 F.3d 508, 519 (6th Cir. 2008) ("Conviction for conspiracy did not require proof that [Defendant] assaulted a particular inmate without justification, only that he joined in the conspiracy that had such assaults as one of its objects."); United States v. Serrata, 425 F.3d 886, 894–96 (10th Cir. 2005) (affirming a conviction under 18 U.S.C. § 242 for failing to intervene, though not participating in, an assault on an inmate). Accordingly, the government was not required to show beyond a

22

reasonable doubt that Brown physically assaulted Potts, Murphy, Rice, or any other inmate.

### c.     Sufficiency of Evidence That Brown Was Part of the Conspiracy

Brown also argues that the government failed to offer evidence that he was part of a conspiracy with Barnes. We disagree. "The government need not offer direct proof of an express agreement on the part of the defendant. Instead, the agreement may be informal and may be inferred entirely from circumstantial evidence." United States v. Whitney, 229 F.3d 1296, 1301 (10th Cir. 2000) (citation omitted). A reasonable jury can infer agreement from "a variety of circumstances, such as, 'sharing a common motive, presence in a situation where one could assume participants would not allow bystanders, repeated acts, mutual knowledge with joint action, and the giving out of misinformation to cover up [the illegal activity].'" Id. (alteration in original) (quoting United States v. Davis, 810 F.2d 474, 477 (5th Cir. 1987)).

Viewing the evidence in the light most favorable to the government, a reasonable jury could conclude beyond a reasonable doubt that Brown entered into an agreement with Barnes to interfere with the constitutional rights of inmates. There is testimony to support a finding that Brown was present during at least three of the four "Meet and Greets" at issue in this case. There is also evidence that he directly participated in the "Meet and Greet" of Potts, as well as the assault on Murphy. And there is evidence from which a reasonable jury could infer that Brown tried to cover up inmate abuse, including

23

changing the shift of Tonia Hardy, a former jail employee, after she reported a deputy's aggressiveness toward an inmate. The record demonstrates that Barnes engaged in very similar behavior, which suggests that Brown and Barnes shared a common motive and mutual knowledge. From this evidence, a reasonable jury could conclude that Defendants had joined in an agreement to deprive inmates of their right to be free from cruel and unusual punishment.

> d.    *Sufficiency of Evidence Tying Brown to Rice's Assault*

Brown also argues that the evidence was insufficient to support a conviction as to Count 2 because there was no evidence that Brown "ever laid a hand on Jace Rice" or "instructed any other jail employee" to do so. Brown Opening Br. at 36. This argument lacks merit. "[E]vidence of direct participation in a substantive offense is not necessary for criminal liability under the principles holding conspirators liable for the substantive crimes of the conspiracy." United States v. Cherry, 217 F.3d 811, 816 (10th Cir. 2000) (citing Pinkerton v. United States, 328 U.S. 640, 647 (1946)). "[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward." Pinkerton, 328 U.S. at 646. Thus, because the jury found Brown to be guilty of conspiracy, it need only make the additional findings that (1) a co-conspirator committed the acts alleged in Count 2 during the time Brown was a member of the conspiracy, and (2) the acts were "committed to achieve an objective of or [were] a foreseeable consequence of that conspiracy." See Tenth Circuit Criminal Pattern Jury Instruction 2.21 (2015) (citing Pinkerton, 328 U.S. at 645–47).

24

There was sufficient evidence for the jury to make these findings. As indicated supra, evidence presented at trial supported a finding that Barnes and Brown had joined in an agreement and acted in concert with others to interfere with the constitutional rights of inmates entrusted to their care and custody. Michael Gray, a jailer at MCJ, testified that Barnes instructed him and another jailer to remove Rice from the vehicle so that his head was "the first thing that touched the ground," and that they followed that order even though Rice was calm and shackled at the time. ROA Vol. II at 1442. From this testimony, a reasonable jury could infer that Gray joined the Brown-Barnes conspiracy, at least during Rice's "Meet and Greet," and that his actions were taken in furtherance of the conspiracy. Thus, there is sufficient evidence to support Brown's conviction on Count 2.

### e. Sufficiency of Evidence of the Necessary Mental Elements

The statute underlying Counts 2 and 3, 18 U.S.C. § 242, requires proof of willfulness, which is "specific intent . . . to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them," see Screws v. United States, 325 U.S. 91, 104 (1945). Willfulness can be inferred from "plainly" wrongful conduct, id. at 106, inconsistency between actions and training, Rodella, 804 F.3d at 1338, and efforts to prevent detection of wrongful behavior, United States v. House, 684 F.3d 1173, 1202 (11th Cir. 2012). All three inferences are supported here. First, the record indicates that all inmates involved in the "Meet and Greets" were in restraints and calm when they arrived, but nonetheless were pulled from the vehicle, and forced to the ground. Several officers then piled on top

25

of each inmate while restraints were switched out, and then each inmate was carried into the jail. These actions, in which Defendants participated, provided a reasonable jury with the basis to conclude that the conduct was "plainly" excessive. Second, CLEET training and jail school taught jailers (and presumably Brown) that inmates in restraints do not pose a sufficient threat to justify throwing them to the ground or striking them. Third, as indicated supra, Brown took efforts to conceal his behavior by retaliating against those jail employees who honestly reported incidents involving use of force. We conclude this evidence is sufficient to show Brown's willfulness.

To convict Brown of violation of an inmate's Eighth Amendment right requires proof of an additional mental element: malicious, sadistic intent. Hudson v. McMillian, 503 U.S. 1, 6 (1992). "We can infer malicious, sadistic intent from the conduct itself where 'there can be no legitimate purpose' for the officers' conduct.'" Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1152 (10th Cir. 2006) (quoting Smith v. Cochran, 339 F.3d 1205, 1213 (10th Cir. 2003)). Numerous witnesses testified that the inmates involved in the "Meet and Greets" were calm and in restraints, thus posing no threat. The only proffered justification for the force used against these inmates was to discourage *future* repetition of their alleged *past* bad behavior. Such punitive treatment does not serve a legitimate penological purpose. See Hope v. Pelzer, 536 U.S. 730, 738 (2002) (concluding that handcuffing an inmate to a hitching post after "[a]ny safety concerns had long since abated" constituted "punitive treatment," which "amounts to gratuitous infliction of 'wanton and unnecessary' pain"). This evidence suggests there was no

26

legitimate purpose for Brown's conduct, which in turn suggests that he acted with malicious, sadistic intent.

> ### f. Sufficiency of Evidence to Overcome Jailer Deference

"Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Whitley v. Albers, 475 U.S. 312, 321–22 (1986) (omission in original) (quoting Bell v. Wolfish, 441 U.S 520, 547 (1979)). In light of this deference, juries may not

> freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the [government], will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

Id. at 322.

However, this deference "does not insulate from review actions taken in bad faith or for no legitimate purpose." Id. As indicated supra, the evidence presented in this case suggests that there were no legitimate purposes underlying Brown's actions. This evidence "goes beyond a mere dispute over the reasonableness of . . . force" and "supports a reliable inference of wantonness," and was therefore sufficient to overcome the deference owed to jailers when acting to maintain the internal order, discipline, or security of the prison. See Whitley, 475 U.S. at 322.

27

g.      *Sufficiency of Evidence Absent Ashley Mullen's Testimony*

In his motion for new trial, Brown essentially reasserts all of the sufficiency arguments discussed above, noting that a district court may weigh evidence and evaluate credibility in considering this motion.  The only new argument raised in the motion for new trial is that the jury inappropriately considered—despite being instructed to the contrary—Ashley Mullen's graphic testimony describing a brutal attack upon on an unidentified inmate.  Even though Mullen testified to what is perhaps, as the district court described it, "the most extreme incident," ROA Vo. I at 620, when we review the evidence as a whole after excluding Mullen's testimony regarding this attack, there is sufficient remaining evidence to support convictions on Counts 1 and 2.  Thus, we also conclude the district court did not abuse its discretion in denying Brown's motion for new trial.

C.      *Challenges to Jury Instructions*

Barnes also challenges the Eighth Amendment standards set forth in the jury instructions.  First, he argues that the district court incorrectly instructed the jury that force is "unnecessary or wanton" if Defendants acted "maliciously *or* sadistically," when in fact the standard is "maliciously *and* sadistically."  Second, he argues that the instructions did not properly instruct the jury that the deference given to jailers "extends . . . to prophylactic or preventive measures intended to reduce the incidence" of violent breaches of order.  Barnes Opening Br. at 41 (quoting Whitley, 475 U.S. at 322).  We

28

conclude the district court's instructions were supported and were a correct statement of the law.

### 1.    *Instruction on Eighth Amendment Standard*

As regards Barnes's three counts of conviction (Counts 1, 2, and 3), the court instructed the jury that "[w]hether a use of force against a jail inmate is unnecessary or wanton depends on whether force was applied in a good faith effort to maintain or restore discipline, or whether it was done maliciously or sadistically for the purpose of causing harm." ROA Vol. I at 467, 474. Barnes challenges the use of the disjunctive "or," arguing that the proper standard requires a showing that Defendants acted *both* maliciously *and* sadistically, rather than simply showing one or the other.

The parties' proposed jury instructions used the conjunctive "and" in describing the required mental state. The disjunctive "or" was first introduced by the instructions prepared by the district court. Despite having adequate time to review the court's proposed instructions and to make objections prior to submitting the instructions to the jury, Barnes "failed to put the district court 'clearly on notice as to the asserted inadequacy' of the jury instruction. Therefore, we review for plain error." United States v. Fabiano, 169 F.3d 1299, 1303 (10th Cir. 1999) (quoting United States v. Duran, 133 F.3d 1324, 1330 (10th Cir. 1998)). Barnes has not identified any authority considering—let alone resolving—this issue. Thus, even if the use of "or" instead of "and" does constitute error, it was not an "obvious or clear" error "contrary to well-settled law." See United States v. Edgar, 348 F.3d 867, 871 (10th Cir. 2003) (quoting Duran,

29

133 F.3d at 1330). Because the plain error standard is not met here, there is no basis to reverse Barnes's convictions on this ground.

## 2. *Instruction on Deference to Jailers*

Barnes also argues that the jury instructions failed to inform the jury that the deference owed to jailers "extends 'to prophylactic or preventive measures intended to reduce' breaches of jail discipline." Barnes Opening Br. at 42 (quoting proposed jury instruction). Barnes raised this issue during the instruction conference, therefore we apply an abuse-of-discretion standard of review. See United States v. Faust, 795 F.3d 1243, 1251 (10th Cir. 2015). "A district court properly exercises its discretion if the jury instructions as a whole 'correctly state the governing law and provide an ample understanding of the issues and the applicable standards.'" United States v. Turner, 553 F.3d 1337, 1347 (10th Cir. 2009) (quoting United States v. Gonzales, 535 F.3d 1174, 1179 (10th Cir. 2008)). "We reverse only if prejudice results from a court's refusal to give a requested instruction." Id.

The district court did not abuse its discretion in rejecting Barnes's proposed instruction and instructing the jury as it did. Barnes has not provided, nor could we find, any authority suggesting that the instruction language he proposed was required. All that matters is that the jury instructions which were given adequately convey the legal principle set forth in the proposed instruction: that jailers are entitled to deference in acting to prevent breaches of jail discipline. That was done here. The jury was instructed to "give deference to prison officials in the adoption and execution of policies and

30

practices that in their judgment are needed to *preserve discipline* and to maintain internal security in a jail." ROA Vol. I at 467, 474 (emphasis added). We see no material difference between the language Barnes insists is required and the language included by the district court. None of the cases Barnes cites suggests that anything more was required. See ROA Vol. I at 280 (citing Hudson, 503 U.S. at 6; Whitley, 475 U.S. at 321–22; Bell, 441 U.S. at 547; Rhodes v. Chapman, 452 U.S. 337, 349 n.14 (1981); Green v. Branson, 108 F.3d 1296, 1300–01 (10th Cir. 1997)). Nor does he explain *why* the language included in the instructions was not sufficient. Accordingly, we conclude the district court did not abuse its discretion when it rejected Barnes's proposed instruction.

## III

### *Government's Cross-Appeal of Sentences*

The district court found, and the parties do not dispute, that Defendants' total offense level was 27 and their criminal history categories were I, resulting in a suggested Guideline range of 70 to 87 months' imprisonment. The district court sentenced Barnes to twelve months and one day of incarceration, followed by two years of supervised release; it sentenced Brown to six months' imprisonment, followed by three years of supervised release  The government appeals these sentences, arguing that they are both procedurally and substantively unreasonable.

We review sentences "for reasonableness under a deferential abuse-of-discretion standard." United States v. Sharp, 749 F.3d 1267, 1291 (10th Cir. 2014). "A district

court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." United States v. Alvarez-Bernabe, 626 F.3d 1161, 1165 (10th Cir. 2010) (quoting United States v. Beltran, 571 F.3d 1013, 1018 (10th Cir. 2009)).  "Reasonableness review is a two-step process comprising a procedural and a substantive component." United States v. Friedman, 554 F.3d 1301, 1307 (10th Cir. 2009) (quoting United States v. Verdin-Garcia, 516 F.3d 884, 895 (10th Cir. 2008)). "Procedural reasonableness involves using the proper method to calculate the sentence," while "[s]ubstantive reasonableness involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007).  The government challenges both the procedural and substantive reasonableness of Defendants' sentences.  We conclude that the verbal pronouncement of Defendants' sentences was procedurally unreasonable, which requires that we remand for resentencing.  Given our remand for resentencing on the procedural unreasonableness claim, we need not address the government's remaining challenges.

"A district court commits procedural sentencing error when it 'fail[s] to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.'" United States v. Mendoza, 543 F.3d 1186, 1191 (10th Cir. 2008) (alteration in original) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).  When a district court imposes a sentence outside the applicable Guideline range, it must "state in open court . . . the specific reason for the imposition of a sentence different from" the

32

recommended range. 18 U.S.C. § 3553(c)(2)). "To satisfy the verbalization requirement of § 3553(c)(2), a district court must describe the salient facts of the individual case, including particular features of the defendant or of his crime, and must explain for the record how these facts relate to the § 3553(a) factors." Mendoza, 543 F.3d at 1192. Such an explanation is required in order to "provide the context required by an appellate court reviewing the sentence for substantive reasonableness." Id.

During separate sentencing hearings, both Defendants moved for downward variances, asking for a term of supervised release and no incarceration. Both sides had an opportunity to argue for the sentences each thought was appropriate in these cases. The district court granted Defendants' motions, but not to the extent requested. The court offered the following explanation in support of granting Barnes's motion:

> In establishing an appropriate sentence for this defendant, the Court has considered the totality of the circumstances regarding the offenses of conviction, including the defendant's role in the offenses. Additionally, the Court has considered the defendant's personal and family responsibilities, employment history, lack of prior criminal history, low risk of recidivism, and the need to avoid unwarranted sentencing disparities.

> * * *

> Taking into consideration the defendant's history and characteristics, his unlikelihood of recidivism, as well as the offense conduct, need for just punishment, deterrence, and protection of the public, the Court finds that a variance based on the sentencing factors cited in 18 United States Code, Section 3553(a) is appropriate in this case. Therefore, . . . the motion for variance is granted. Not necessarily what's being asked.

> * * *

33

In formulating the sentence imposed, this Court has considered the nature and circumstances of the offense, as well as the characteristics and criminal history of the defendant. The Court has further taken into consideration the sentencing guideline calculations contained within the presentence report, in addition to any objections, clarifications, additions, or deletions to those guideline calculations identified in the addendum to the report or announced in open court today. While the Court recognizes that it is not bound by the sentencing guideline calculations, the Court has considered them and finds them to be advisory in nature. The sentence prescribed by this Court reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. This sentence affords adequate deterrence to criminal conduct, protects the public from further crimes of this defendant, and provides correctional treatment for the defendant in the most effective manner.

ROA Vol. II at 1089–94. The district court's justification of Brown's sentence was nearly identical to that it gave for Barnes's sentence. Compare id. with id. at 1160–65. The only meaningful difference between the two colloquies is that the court did not mention "employment history" in sentencing Brown, which presumably reflects Brown's struggle to maintain stable employment after being indicted.

The government argues that the district court did not sufficiently tie the rationale for the sentences it imposed to the § 3553(a) factors. Defendants suggest that the district court's reasons can be ascertained from a review of the record as a whole. Defendants rely primarily on questions asked and comments made by the district court during the parties' arguments. Admittedly, the district court was very active during the sentencing hearing. See, e.g., id. at 1073 (questioning the government about Barnes's "probability of recidivism"), 1077 (asking the government whether "a culture of fear and intimation is probably necessary to keep control in a jail"), 1079–80 (disagreeing with the government

34

regarding the frequency with which inmates' head would strike surrounding objects while they were carried into the MCJ), 1137 (asking whether the government would "agree that the level of danger to a law enforcement officer in prison is greater than that of any other person"), 1144 (asking the government whether any correctional treatment would benefit Brown). Defendants suggest that these and similar comments or questions demonstrate that the district court varied downward because (1) the inmates had violent pasts, (2) the court did not think the resulting injuries were particularly serious, (3) incarceration would be more difficult for Defendants because they had served as jail administrators for several years, (4) the investigation leading to Defendants' arrests was triggered by Barnes reporting a jailer for abusing an inmate, (5) Defendants' lack of criminal history, (6) low likelihood of recidivism, and (7) personal and family responsibilities.

We are not convinced. Although the record indicates that the district judge was aware of and had questions about these facts, it is not clear which (if any) of these or other facts the district judge *actually relied on* in varying downward, or how these facts relate to the § 3553(a) factors. We cannot meaningfully review the district court's decision based on the record before us. We therefore conclude that the sentencing was procedurally unreasonable.

We must next determine whether the procedural error is harmless. See Fed. R. Crim. P. 33. "Harmlessness must be proven by a preponderance of the evidence, and the burden of making this showing falls on the beneficiary of the error," the Defendants. United States v. Lente, 647 F.3d 1021, 1037 (10th Cir. 2011) (quoting United States v.

<u>Cerno</u>, 529 F.3d 926, 939 (10th Cir. 2008)).  "A harmless error 'is that which did not affect the district court's selection of the sentence imposed.'" <u>Id.</u> at 1037–38 (quoting <u>United States v. Kaufman</u>, 546 F.3d 1242, 1270 (10th Cir. 2008)).  Defendants argue that the district court's active engagement during the parties' discussion of the § 3553(a) factors demonstrates that had the court employed greater specificity when providing its reasons in support of the sentences imposed, the resulting sentences would not have increased.  We have rejected this type of bare-bones argument before.  <u>See</u> <u>id.</u>  Without a more thorough consideration of the § 3553(a) factors, we are left with the firm conviction that the direct effect of the procedural error was the district court's imposition of unusually lenient sentences, falling far below the applicable Guidelines range.  We therefore vacate Defendants' sentences and remand for resentencing.

IV

*Conclusion*

For the reasons set forth above, we **AFFIRM** Defendants' convictions, **VACATE** their sentences as procedurally unreasonable, and **REMAND** for resentencing.


Entered for the Court


Mary Beck Briscoe
Circuit Judge


36